## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DONLIN, III,** | : | **CIVIL ACTION NO. 3:13-CV-01912** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

### Background

The above-captioned action seeks review of a decision of the Commissioner

of Social Security ("Commissioner") denying Plaintiff John Donlin, III's claim for

social security disability insurance benefits and supplemental security income

benefits.  Under 42 U.S.C. § 405(g) and relevant case law, the court is generally

limited to reviewing the administrative record to determine whether the decision is

supported by substantial evidence.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is undisputed that

Donlin met the insured status requirements of the Social Security Act through

March 31, 2011.  Tr. 14, 15, 109, 111, 127 and 180.[1]  In order to establish entitlement

to disability insurance benefits Donlin was required to establish that he suffered

from a disability on or before March 31, 2011.  42 U.S.C. §423(a)(1)(A), (c)(1)(B); 20

C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program

funded by general tax revenues (not social security taxes).  It is designed to help

aged, blind or other disabled individuals who have little or no income.  Insured

status is irrelevant in determining a claimant's eligibility for supplemental security

income benefits.

On June 22, 2010, Donlin protectively filed[2] an application for disability

insurance benefits and an application for supplemental security income benefits.

Tr. 14, 63, 103-109, 111 and 125.  On September 20, 2010, the Bureau of Disability

Determination[3] denied Donlin's applications. Tr. 81-88.  On October 27, 2010, Donlin

filed a request for a hearing before an administrative law judge. Tr. 14 and 92.  The

_____

[1]References to "Tr._" are to pages of the administrative record filed by the
Defendant as part of the Answer on September 18, 2013.

[2]A protective filing occurs when an individual initially contacts the Social
Security Administration regarding a claim for benefits and requests an expedited
filing date. Simply stated, it allows an individual to have an application date based
upon the date of his or her first contact with the Administration.

[3]The Bureau of Disability Determination is an agency of the state which
initially evaluates applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security Administration.  Tr. 81 and
85.

request was granted and a hearing was held on October 25, 2011. Tr. 14 and 22-36.

Donlin was represented by counsel at the hearing. Id.

Donlin in his applications for disability insurance benefits and supplemental

security income benefits alleged that he became disabled on October 11, 2008. Tr.

103 and 107.  However, at the administrative hearing Donlin amended the disability

onset date to September 1, 2009. Tr. 25.  In documents filed with the Social Security

Administration and at the administrative hearing, Donlin claimed that he was

disabled because of frequent epileptic seizures. Tr. 24-25 and 131. Absent the

epileptic seizures, there is no evidence that Donlin would be unable to meet the

physical and mental demands of sedentary to very heavy work, including the

sitting, standing, walking, lifting and carrying requirements.[4] Id.

---

[4]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are

On November 2, 2011, the administrative law judge issued a decision denying Donlin's applications. Tr. 68-76.  The administrative law judge found that Donlin failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id.  The administrative law judge concluded that Donlin had the ability to engage in a limited range of unskilled, medium work. Id.  The administrative law judge set Donlin's residual functional capacity at a limited range of unskilled, medium work, and found that Donlin's claims regarding the frequency of the epileptic seizures were not credible and were not supported by the objective medical evidence. Tr. 72-73.  On January 5, 2012, Donlin filed a request for review with the Appeals Council.  Tr. 6-11.  On May 14, 2013, the Appeals Council concluded that there was no basis upon which to grant Donlin's

---

additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

4

request for review. Tr. 1-5.  Donlin filed the instant complaint in this court on July 12, 2013.

Donlin was born in the United States on August 2, 1973, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not significantly impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c); Tr. 103, 107 and 125.  Donlin graduated from high school in 1991 and can read, write, and converse in English and perform basic mathematical functions. Tr. 129, 131, 144 and 164.  During his elementary and secondary schooling, Donlin attended regular education classes. Tr. 131. After graduating from high school Donlin did not complete "any type of specialized job training, trade or vocational school." Id.

Donlin's work history covers 18 years and at least 15 different employers. Tr. 110 and 117-121.  The records of the Social Security Administration reveal that Donlin had earnings in the years 1991 through 2008. Tr. 110.  Donlin's annual earnings range from a low of $328.13 in 1991 to a high of $19,506.46 in 2007. Id.  The sum of Donlin's earnings during those 18 years is $97,906.84. Id.  A vocational

---

[5]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Donlin was 38 years of age at the time of the administrative hearing. Tr. 33.

expert identified Donlin's past relevant employment[6] as (1) a forklift operator which the vocational expert described as semi-skilled, medium work; (2) a machine operator described as semi-skilled, medium work; and (3) a warehouse worker described as unskilled, medium work . Tr. 33.   Donlin testified that he last worked as a forklift operator in October, 2008. Tr. 27, 120-121 and 190.   Donlin further testified that he resigned that position not because of his alleged disabling epilepsy but because he got married and moved from the area but then inconsistently asserted that he was "let [] go and laid [] off." Id.   After being "laid off" Donlin applied for and received unemployment compensation until the fourth quarter of 2009.[7] Tr. 27, 104 and 116.

The relevant time period  for assessing whether substantial evidence supports the administrative law judge's decision denying Donlin disability insurance benefits  is September 1, 2009, Donlin's amended alleged disability onset date, through March 31, 2011, when his insured status expired.  To be awarded disability insurance benefits Donlin was required to establish that he met the requirements of a listed impairment or suffered from physical or mental functional

---

[6]Past relevant employment in the present case means work performed by Donlin during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

[7]Records from the Social Security Administration reveal that he received $498.00 in unemployment compensation benefits during the 3rd quarter of 2009. Tr. 116.

impairments on or before March 31, 2011, which prevented him from engaging in substantial gainful activity.  As for Donlin's claim for supplemental security income benefits, the relevant period of time extends through the date of the administrative hearing.

## I.    Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been

described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213. In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial

evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict created

by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a

court reviewing the decision of the Commissioner must scrutinize the record as a

whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano,

606 F.2d 403, 407 (3d Cir. 1979).

## II.    Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §§ 404.1520 and 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that

---

[8]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. §§ 404.1510 and 416.910.

is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and

---

[9]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's performance of basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. §§ 404.1545(b) and 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 416.945(c).

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2,

1996).  A regular and continuing basis contemplates full-time employment and is

defined as eight hours a day, five days per week or other similar schedule.  The

residual functional capacity assessment must include a discussion of the

individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at

359 n.1 ("'Residual functional capacity' is defined as that which an individual is still

able to do despite the limitations caused by his or her impairment(s).").

III.   **Medical Records**

Before we address the administrative law judge's decision and the arguments

of counsel, we will review Donlin's pertinent medical records and we will

commence with records from October, 2008, which predate Donlin's amended

alleged disability onset date of September 1, 2009.

On or about October 10, 2008 at 9:30 a.m., Donlin allegedly had a seizure

episode while he was sleeping which was observed by his girlfriend. Tr. 205.  The

girlfriend reported that Donlin started moaning and he was shaking with his hands

clenched and staring straight ahead. Id.  The episode lasted 1-2 minutes and then

Donlin went into a deep sleep and was snoring loudly and his girlfriend could not

wake him up for about five minutes. Id.  After coming out of the deep sleep, he

purportedly vomited, and experienced malaise the rest of the day. Id.  The records

are limited with respect to Donlin's initial treatment for this episode but it appears

that he was examined and underwent some diagnostic testing at the Geisinger

medical facility in Berwick and then was transferred on the same day to the

Geisinger Medical Center in Danville.  Tr. 205, 331, 349-350 and 402.   Donlin

underwent a CT scan of the head at the Berwick facility which was repeated after

he arrived at the Danville facility.  The Danville CT scan revealed "[n]o acute

intracranial pathology" and was reported to be "[u]nremarkable." Tr. 208 and 349.

Donlin also underwent a drug screening which revealed a positive result for

cannabinoids.[12] Tr. 331.

---

[12]"Cannabis, also know as marijuana, is a plant from Central Asia that is
grown in many parts of the world today.  The Cannabis plant produces a resin
containing compounds called cannabinoids. . . . Cannabinoids are active chemicals
in Cannabis that cause drug-like effects throughout the body, including the central
nervous system and the immune system." Cannabis and Cannabinoids, National
Cancer Institute, http://m.cancer.gov/topics/CAM/cannabis/Patient (Last accessed
June 5, 2014).  There are approximately 480 different compounds in marijuana 66 of
which are classified as cannabinoids.    The cannabinoid compound that is generally
known and recognized is delta- 9-tetrahydrocannibinol or THC. See Learn About
Marijuana, University of Washington, Alcohol & Drug Abuse Institute,
Cannabinoids, http://adai.uw.edu/marijuana
/factsheets/cannabinoids.htm (Last accessed June 5, 2014).  There is a dispute in the
medical community regarding whether marijuana is an appropriate treatment for
seizure disorders, including epilepsy.  "Marijuana might make seizure disorders
worse in some people; in other people it might help to control seizures." Marijuana
Side Effects & Safety, WebMD,
http://www.webmd.com/vitamins-supplements/ingredientmono-947-MARIJUANA.a
spx?activeIngredientId=947&activeIngredientName=MARIJUANA (Last accessed
June 5, 2014).  One research article from the Department of Neurology, NYU School
of Medicine, indicates that "[m]arijuana use can transiently impair short-term
memory, and like alcohol use, may increase noncompliance with [anti-epileptic
drugs].  Marijuana use or withdrawal could potentially trigger seizures in
susceptible patients." Gordon, E., Devinsky, O., Alcohol and marijuana: effects on
epilepsy and use by patients with epilepsy, Epilepsia, 2001 Oct; 42(1): 1266-72;
Abstract, U.S. National Library of Medicine, National Institutes of Health,
http://www.ncbi.nlm.nih.gov/
pubmed/11737161 (Last accessed June 5, 2014). Prior to October, 2008, Donlin did
not report a history of seizures, and he has not argued that he was using marijuana
to help control his alleged seizures.

After arriving at the Geisinger Medical Center in Danville, Donlin was examined in the emergency department by Amy J. Snover, M.D.  Tr. 209.  Donlin reported no prior history of seizures, and he had no difficulty walking;  although feeling tired, he did not have a headache or weakness, numbness or vision changes. Tr. 205.  Donlin also told Sally Rightmyer, a registered nurse, that he was "on no med[ications]." Tr. 402. The results of a physical examination performed by Dr. Snover were essentially normal, including he had a normal heart rhythm, normal speech, no weakness of the arms or legs, and a normal gait.  Tr. 206.  While in the emergency department Donlin had no seizures. Tr. 208.  Dr. Snover's assessment was that Donlin suffered from seizure-like activity and drug use.  Id.  Donlin was discharged from the hospital apparently on or about October 11, 2008, in a stable condition with instructions to follow-up with his primary care physician and a neurologist and to return to the emergency department if his symptoms worsened. Id.

Seven months passes before we encounter the next record of medical treatment. Tr. 217-218.   On May 13, 2009, Donlin visited the emergency department at the Berwick Hospital complaining of a seizure episode. Tr. 217.   The episode occurred while Donlin was sleeping and was allegedly witnesses by his girlfriend.[13] Id.  The girlfriend could not wake Donlin up and she called 911. Id.  The description given by the girlfriend was characterized by Salman Lateef, M.D., the emergency

---

[13]Donlin's girlfriend did not testify at the administrative hearing.

13

room physician, as a "tonic/clonic seizure . . .[and Donlin] was postictal for 20 minutes and later he was confused."[14] Id.   While at the emergency department medical personnel observed "[n]o seizure activity" and he was treated with the drug Dilantin.[15] Id.   The results of a physical examination were essentially normal other

---

[14]There are two broad catergories of seizures: generalized and partial. Generalized seizures involve "electrical impulses throughout the entire brain." Partial seizures involve only a small portion of the brain.  The portion of the brain "generating the seizures is sometimes called the focus." There are six categories of generalized seizures: (1) "grand mal" or generalized tonic clonic involving unconsciousness, convulsions and muscle rigidity; (2) absence involving brief loss of consciousness; (3) myoclonic involving sporadic, isolated jerking movements; (4) clonic involving repetitive jerking movements; (5) tonic involving muscle stiffness and rigidity; and (6) atonic involving loss of muscle tone.  There are three categories of partial seizures: (1) simple (subdivided into simple motor involving jerking, muscle rigidity, spasms and head turning; simple sensory involving unusual sensation affecting either vision, hearing, smell, taste or touch; and simple psychological involving memory or emotional disturbance); (2) complex involving impairment of awareness and  automatisms such as lip smacking, chewing, fidgeting, walking and other repetitive, involuntary but coordinated movements; and (3) partial seizure with secondary generalization involving symptoms where a person initially remains conscious but then loses consciousness or goes into convulsions. Epilespy Seizure Types and Symptoms, WebMD, http://www.webmd.com/epilepsy/guide/types-of-seizures-their-symptoms (Last accessed June 5, 2014). "Epileptic seizures have three phases. The preictal phase is the time leading up to the seizure. The ictal phase is the seizure itself. The postictal phase is the period after the seizure. The postictal phase may last from seconds to days, depending on the type of seizure. Several types of symptoms are associated with the postictal period[.]" After Seizure Symptoms, Livestrong.com, http://www.livestrong.com/article/124340-after-seizure-symptoms/(Last accessed June 5, 2014).  Those symptoms can include headaches, confusion, drowsiness, muscle soreness, weakness and psychiatric disturbance. Id.

[15]Dilantin (generic phenytoin) is an anti-epileptic drug which is used to control seizures but does not control all types seizures and has several side effects including causing skin rashes. Dilantin, Drugs.com, http://www.drugs.com/dilantin.html (Last accessed June 5, 2014).

than he was positive for a horizontal nystagmus.[16] Tr. 217-218.  Several diagnostic

tests were ordered by Dr. Lateef, including an electroencephalogram (EEG) and a

CT scan of the head. Tr. 218-219 and 381-382.  Donlin told the individual performing

the EEG that his "'knees buckle' when he gets up too fast." Tr. 381.  The EEG was

reported as "normal in the awake and spontaneous sleep state" with "[n]o

epileptiform discharges[.]" Tr. 382.  The CT scan was  reported as "negative." Tr.

218-219.   Donlin was discharged from the hospital on May 14, 2009, with a

prescription for Dilantin and instruction to follow-up with his family physician and

a neurologist. Tr. 219.

Donlin was admitted to the Geisinger Medical Center in Danville on July 9,

2009, after he stopped taking Dilantin due to an allergic reaction. Tr. 232-245.

Donlin reported having a seizure on July 8th and one the morning of July 9th. Id.

The seizures were described as occurring while he was sleeping and witnessed by

his girlfriend who stated that Donlin would "make a loud grunting noise, go into a

fetus position and have shaking of his upper extremities for 15-30 seconds." Tr. 232.

The girlfriend also apparently reported that after the episodes Donlin upon

awakening would appear confused and be unaware of his surroundings. Id.  Donlin

also reported that the episodes involve "an aura" where he has "a tingling feeling

that starts in his toes and goes up his body" and "he will lose his train of thought."

---

[16]Nystagmus is defined as "an involuntary, rapid, rhythmic movement of the
eyeball which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties."
Dorland's Illustrated Medical Dictionary, 1307 (32nd Ed. 2012).

Id.  Donlin denied any tongue biting, loss of bowel or bladder control, chest pain, shortness of breath, nausea, vomiting, headaches or change of vision. Id.  Donlin reported that he was chewing one can of tobacco every 2 to 3 days. Id.  The results of a physical and neurological examination were essentially normal other than it was observed that Donlin had poor dentition. Tr. 233-234.  Donlin was alert and oriented to person, place and time; he had normal recent and remote memory, normal attention span and concentration, and normal language and fund of knowledge; he had normal deep tendon reflexes, coordination, gait, and station; and he had normal muscle tone and strength in the upper and lower extremities with no atrophy or abnormal movements.  Tr. 233-234.  Various diagnostic tests were performed during his hospitalization, including a drug screen, an EEG, an MRI of the brain, a CT scan of the head and an EKG. Tr. 237-238, 311, 344-345, 347 and 386. Although Donlin denied drug abuse when questioned by a physician, the drug screen revealed that Donlin had consumed cannabinoids. Tr. 243-244 and 311.  The EEG was reported as "normal in the awake and spontaneous drowsy state" with "no epileptiform discharges[.]" Tr. 238.  The MRI of the brain revealed a single, nonspecific, indeterminate finding in the left periventricular white matter "likely represent[ing] the residua of a remote insult (e.g. ischemic infarction, trauma, inflammation etc)," but no other abnormality. Tr. 344.  The CT scan revealed a "[s]table appearance of the brain with no acute intracranial pathology." Tr. 347. The EKG revealed a normal heart rhythm. Tr. 386.  Donlin was discharged from the hospital on July 14, 2009, with no discharge medications and instructions to follow-

16

up with his family physician, Frank G. Gilliam, M.D.   Tr. 231.  The discharge

summary noted that Donlin did not exhibit any seizure episodes during his

hospitalization. Id.

On July 16, 2009, Donlin had an appointment with Dr. Gilliam. Tr. 388-390.

Donlin told Dr. Gilliam that a "typical event consists of an unusual 'sick' feeling in

his abdomen followed by a garlic-like taste with a sense that he is 'in a bubble' and

disconnected from his surroundings." Tr. 388.  Donlin stated that his "wife saw one

this week, and described two minutes of decreased responsiveness, staring and oral

gestural automatisms[.]" Id.  Donlin  told his "wife that he had experienced a 'rush

from his toes to his head.'" Id.   Donlin told Dr. Gilliam that he had experienced 5

such episodes in the last 9 months. Id.   Donlin also reported four episodes while

sleeping, three that were witnesses by his girlfriend, which Dr. Gilliam

characterized as generalized tonic-clonic seizures but that the etiology was

unknown. Id.  Dr. Gilliam noted that Donlin had not taken any anti-epileptic drugs

in the past except for phenytoin (Dilantin) for a brief period.  Id.  The Dilantin was

discontinued because Donlin developed a rash.  Tr. 389.  The results of a physical

and neurological examination performed by Dr. Gilliam were normal. Tr. 389-390.

Dr. Gilliam's impression was that Donlin had "a history of paroxysmal[17] symptoms

and behavior changes that are consistent with complex partial seizures of temporal

---

[17]Paroxysmal is defined as "recurring in paroxysms." Dorland's Illustrated
Medical Disctionary, 1384 (32nd Ed. 2012). A paroxysm is "a sudden recurrence or
intensification of symptoms" or "a spasm or seizure." Id.

lobe origin . . . He did not have an event during the recent video/EEG, but this does not exclude the diagnosis of epilepsy." Tr. 390.  Dr. Gilliam prescribed lamotrigine chewable tablets[16] because Donlin reported that he could not swallow pills and scheduled a  follow-up appointment. Id.

The follow-up appointment occurred on November 23, 2009. Tr. 395-396.  Dr. Gilliam noted in the report of the appointment that Donlin was returning for examination because "of a history of possible seizures since [October, 2008]." Tr. 395.  Dr. Gilliam further noted that Donlin was chewing one can of tobacco every 2-3 days and that he had recently used marijuana. Tr. 396.  Donlin's  prescribed medication was listed as lamotrigine chewable tablets. Id.  The results of a physical and neurological examination were normal. Tr. 397.  Dr. Gilliam's diagnostic assessment remained the same and he increased Donlin's dosage of lamotrigine and ordered a repeat video/EEG to make a definitive diagnosis. Id.

On February 8, 2010, Donlin was admitted to the Geisinger Medical Center for long-term EEG monitoring. Tr. 246-254.  Donlin admitted to recently using marijuana, and a drug screen was positive for cannabinoids. Tr. 250 and 281.  The results of a physical and neurological examination were normal, including Donlin was alert and oriented to person, place and time; he had normal recent and remote memory, normal attention span and concentration, and normal language and fund

---

[16]Lamotrigine (brand name Lamictal) is an anti-seizure medication used either alone or in combination with other drugs to treat epileptic seizures. Lamotrigine, Drugs.com, http://www.drugs.com/mtm/lamotrigine.html (Last accessed June 5, 2014).

of knowledge; he had normal deep tendon reflexes, coordination, gait, and station; and he had normal muscle tone and strength in the upper and lower extremities with no atrophy or abnormal movements. Tr. 251.  The EEG revealed "frequent left anterior temporal sharp waves during drowsiness and sleep" which are "typically seen in patients with a history of partial seizures[.]" Tr. 260.  Donlin was discharged from the hospital on February 15, 2010, with prescriptions for Ativan[17] and lamotrigine. Tr. 246.  He was instructed to follow-up with Dr. Gilliam and to resume activities (except for driving) as tolerated. Id. There were no reported seizure episodes during Donlin's hospitalization. Tr. 246-254.

On June 28, 2010, Donlin visited the emergency department at Geisinger Medical Center at Danville complaining of an aura of the type that typically proceeded a seizure. Tr. 255-261.  Donlin stated that on two occasions earlier that day after awakening from sleep he had a taste of garlic in his mouth. Tr. 255.  He reported that after getting out of bed and walking "around his house [] he had some slight pressure and nonspecific dizziness in his head." Id.  He stated that he recovered quickly, had no loss of consciousness, no generalized seizure activity, and no focal clonic, tonic or myoclonic jerking. Tr. 258.  Donlin admitted that he was supposed to be taking Keppra 500 mg twice a day but because of some difficulty

---

[17]Ativan (generic lorazepam) is a psychotropic drug used to treat anxiety disorders but also can be used for other purposes. Ativan, Drugs.com, http://www.drugs.com/ativan.html (Last accessed June 5, 2014).

swallowing he had been only taking 250 mg twice a day.[18] Tr. 255.  The results of a physical and neurological examination were essentially normal. Tr. 259-260.  Donlin was alert and oriented to person, place and time; he had normal recent and remote memory, normal attention span and concentration, and normal language and fund of knowledge; he had normal deep tendon reflexes, coordination, gait, and station; and he had normal muscle tone and strength in the upper and lower extremities with no atrophy or abnormal movements. Id.  The examining physician's assessment, based in part on the results of the recent EEG, was that Donlin suffered from "[l]eft temporal lobe epilepsy causing complex partial seizures." Tr. 260.  Donlin was prescribed a liquid form of Keppra so that he could take the full 1000 mg per day. Tr. 261.

On July 7, 2010, Donlin had an appointment with Dr. Gilliam at which Donlin reported that he had four seizures in the last three months. Tr. 410-412.  Donlin admitted chewing 1 can of tobacco every 2-3 days and smoking marijuana in the last seven days. Tr. 411.  The results of a physical and neurological examination were essentially normal. Tr. 410-411.  Dr. Gilliam's assessment remained the same, i.e., Donlin suffered from "a history of paroxysmal symptoms and behavior changes that are consistent with complex partial seizures of temporal lobe origin[.]" Tr. 412.  Dr. Gilliam noted that Donlin had recently been seen in the emergency department at

---

[18]Keppra (generic levetiracetam) is an anti-seizure medication used to treat epilepsy. Keppra, Drugs.com, http://www.drugs.com/keppra.html (Last accessed June 5, 2014).

Geisinger and that his prescription for lamotrigine had been discontinued and he had been prescribed Keppra.  Id.  Dr. Gilliam increased Donlin's dosage of Keppra to 1000 mg twice a day and ordered a repeat EEG. Id.

On September 8, 2010, Donlin was admitted to the Geisinger Medical Center for long-term EEG monitoring. Tr. 362-364.  Donlin at the time of admission reported that he was having 1 seizure about every 3 months which lasted 1 to 2 minutes. Tr. 363.  The most recent seizure occurred on Sunday, September 5, 2010. Tr. 372.  The results of a physical and neurological examination were essentially normal. Tr. 368-369.  Donlin was alert and oriented to person, place and time; he had normal recent and remote memory, normal attention span and concentration, and normal language and fund of knowledge; he had normal deep tendon reflexes, coordination, gait, and station; and he had normal muscle tone and strength in the upper and lower extremities with no atrophy or abnormal movements. Id.  Donlin was taken off of his medications to try to induce a seizure while he was being monitored, but no overt seizures occurred. Tr. 363.  However, the EEG revealed "an occasional left anterior temporal sharp wave [suggestive of] epileptogenic potential[.]" Donlin was discharged from the hospital on September 22, 2010, with a prescription for Keppra. Tr. 362.

On December 15, 2010, Donlin had a follow-up appointment with Dr. Gilliam at which Donlin and his wife reported that he had not had any seizures or auras over the previous three months.  Tr. 431.  Donlin previously had not been taking the evening dose of Keppra. Id.  Dr. Gilliam noted that Donlin's report of the absence of

seizures was "a major improvement after achieving the actual target dosage of [Keppra]." Id. Donlin reported no medication side effects. Tr. 433.

On April 18, 2011, Donlin had an appointment with Dr. Gilliam at which Donlin reported that he had not had a seizure for seven months prior to March 28, 2011. Tr. 450. However, he stated that on March 28th he had three seizures. Id. Donlin admitted chewing tobacco and smoking marijuana in the last seven days. Tr. 451. Dr. Gilliam noted that Donlin had been taking 1000mg of Keppra each night but, because of complaints of fatigue, the dosage had been reduced to 500 mg. Tr. 450. The results of a physical and neurological examination were essentially normal. Tr. 451-452. Dr. Gilliam's assessment remained the same, i.e., Donlin suffered from "a history of paroxysmal symptoms and behavior changes that are consistent with complex partial seizures of temporal lobe origin." Tr. 452. Dr. Gilliam started Donlin on a new anti-seizure medication, Zonegran, and discussed decreasing Donlin's dosage of Keppra once he was taking a sufficient dosage of Zonegran. Id.

On May 17, 2011, Donlin had a call placed to Dr. Gilliam to report that he was having severe mood changes on the Zonegran. Tr. 457. Donlin's dosage of Zonegran was reduced and during a subsequent phone conversation Donlin reported that he was feeling better and that he had not had any seizures since the decrease in the dosage of Zonegran. Id.

On July 14, 2011, Donlin sought a second opinion regarding his seizures from Hans Pinkert, M.D., a neurologist at the Hershey Medical Center. Tr. 463-465, 469-

22

471 and 473-475. Donlin reported that over the prior few months he was having

around 3 seizures per month. Tr. 463.  Donlin admitted to "virtual daily marijuana

use." Tr. 464.   The results of a physical and neurological examination performed by

Dr. Pinkert were normal. Tr. 464, 470 and 474.  Dr. Pinkert noted that three prior

EEGs captured no seizure events and no interictal[19] abnormalities other than

slowing in the right temporal region. Tr. 463.  Dr. Pinkert's assessment was that

Donlin suffered from "likely partial epilepsy with impairment of consciousness, not

intractable"[19] and he ordered another EEG. Tr. 464.  No seizures were observed by

Dr. Pinkert or evidenced by any diagnostic testing. Tr. 464-465.

On August 5, 2011, Donlin underwent an EEG at the Hershey Medical Center

which was reported to be normal with "no epileptiform discharges" and "no

electrographic seizures." Tr. 467.  In the report of this EEG it was noted that Donlin

stated that his seizures occurred mainly when he was sleeping and that he was

doing better on medication. Id.

The record contains a letter from Donlin's attorney to a "Dr. Glenn A.

Stayer" at the Geisinger Medical Center in Danville dated July 15, 2011, asking Dr.

Stayer to answer "yes" or "no" to a series of questions regarding Donlin's epilepsy.

---

[19]Interictal is defined as "occurring between attacks or paroxysms."
Dorland's Illustrated Medical Dictionary, 949 (32nd Ed. 2012).

[19]Intractable epilepsy is where a person will continue to experience seizures
even with the best available treatment. Seizures and Epilepsy: Hope Through
Research, National Institute of Neurological Disorders and Stroke,
http://www.ninds.nih.gov/disorders/epilepsy/detail
_epilepsy.htm (Last accessed June 5, 2014).

Tr. 448-449.   On the letter, boxes are checked "yes" indicating that Donlin has

convulsive epilepsy, the epilepsy is documented by detailed descriptions of a typical

seizure pattern including associated phenomena, Donlin's episodes include daytime

episodes with loss of consciousness and convulsive seizures, and Donlin's episodes

include nocturnal episodes manifesting residuals which interfere significantly with

activity during the day. Tr. 448.   However, on the letter a box was checked "no"

indicating that Donlin's episodes did not occur more than once a month in spite of

at least three months of prescribed treatment. Id.   The questionnaire was not

signed by any physician. Tr. 448-449.   Donlin asserts that this form was completed

by Dr. Gilliam.[20]

On October 19, 2011, Donlin's counsel sent an identical letter to Dr. Pinkert.

Tr. 477.   On the letter, boxes are checked "yes" indicating that Donlin has

convulsive epilepsy, the epilepsy is documented by detailed descriptions of a typical

seizure pattern including associated phenomena, Donlin's episodes include daytime

episodes with loss of consciousness and convulsive seizures, and  Donlin's episodes

occur more than once a month in spite of at least three months of prescribed

treatment. Id.    However, on the letter a box was checked "no" indicating that

Donlin episodes did not include nocturnal episodes manifesting residuals which

interfere significantly with activity during the day. Id.   The questionnaire was not

_____

[20]The court will assume for purposes of the present appeal that the form was
completed by Dr. Gilliam.

signed by any physician. Tr. 477-478.  Donlin asserts that this form was completed by Dr. Pinkert.[21]

The record only reveals that Dr. Pinkert examined Donlin on two occasions: July 14, 2011, the consultation for a second opinion and possibly on August 11, 2011, when the EEG was performed at Hershey Medical Center.  Other than Donlin's reports and a statement from his girlfriend dated September 21, 2011,[22] there is no evidence, including medical evidence, to support the existence of any seizures after March 28, 2011.   In fact, there is no objective medical evidence of seizures occurring.  The only evidence of seizures is Donlin's testimony and his girlfriend's alleged observations of seizure activity.  The objective medical evidence viewed in a light most favorable to Donlin merely establishes the potential for epileptic seizures to occur.

**IV.**    **<u>Discussion</u>**

The administrative law judge at step one of the sequential evaluation process found that Donlin did not engage in substantial gainful work activity since September 1, 2009, the amended alleged onset date. Tr. 70.

At step two of the sequential evaluation process, the administrative law judge found that Donlin had the severe impairment of epilepsy. <u>Id.</u>   The administrative

---

[21]The court will assume for purposes of the present appeal that the form was completed by Dr. Pinkert.

[22]Tr. 196-199.

law judge stated that the "impairment is considered severe in that it causes some limitation in [Donlin's] ability to perform some basic work activities." Id.

At step three of the sequential evaluation process the administrative law judge found that Donlin did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment. Tr. 70-71.  The administrative law judge stated that "[i]n order to make this determination" he "reviewed and examined the requirements of the listings, including, but not limited to sections 11.00, et seq., specifically considering listing 11.02, as well as the medical evidence, and . . . concluded that [Donlin] is not presumptively disabled pursuant to 20 C.F.R. 404.1520(d) or 20 C.F.R. 416.920(d) because the evidence of record does not document the specific findings required for listing severity." Tr. 71.

At step four of the sequential evaluation process, the administrative law judge limited Donlin to medium work as defined in the regulations except Donlin had to avoid exposure to hazards such as unprotected heights and dangerous machinery and he could not drive vehicles or similar machinery. Id.   In setting the residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the treating physicians' medical notes.  The administrative law judge also considered the fact that Donlin previously engaged in medium work and that the only limiting condition would be if he had frequent and uncontrolled epileptic seizures.  The administrative law judge found that Donlin's statements regarding the frequency and severity of his seizures were not credible and also rejected the opinion Dr. Pinkert set forth in the form letter dated

26

October 19, 2011.  The administrative law judge explained his credibility judgment

and rejection of the opinion of  Dr. Pinkert in pertinent part as follows:

> When the claimant saw Dr. Gilliam . . . on April 20,[23] 2011, he reported that he
> had not had any seizures for seven months, prior to March 28, 2011. On that
> date, he reported having  three seizures. . . . [I]t appear that the seizures of
> March 28, 2011 were preceded by the claimant only taking 500 mg instead of
> 1000 mg of medication.  The claimant's examination on April 20, 2011 was
> benign, with no neurological deficits or abnormalities noted.  Dr. Gilliam
> changed the claimant's medication to [Zonegran] and discussed decreasing
> the claimant's [Keppra][.]
>
> In July 2011, the claimant consulted with Hans Pinkert, M.D. . . The claimant
> reported that within the past few months he was having around three seizures
> per month.  However, there are no medical records to support the existence of
> any seizures after March 28, 2011.  For example, on May 17, 2011, the
> claimant's fiancé reported that the claimant had no seizures. . .  In any event,
> Dr. Pinkert's examination revealed no particular abnormalities or deficits.  He
> recommended another EEG which occurred in August 2011 with a normal
> result.
>
> As for opinion evidence, the questionnaires that apparently were completed
> by Dr. Gilliam and Dr. Pinkert are given little weight. . . The responses were
> not signed by the doctors and there is no documentation to confirm the
> responses to the questions posed were completed by the doctors.  Also, the
> responses provided by these two doctors are not consistent. Specifically, Dr.
> Gilliam checked "no" to "Have the Claimant's convulsive episodes occurred
> more frequently than once a month in spite of at least three months of
> prescribed treatment" and Dr. Pinkert checked "Yes."  However, the above-
> described treatment records show that the answer is "No." . . . Therefore, the
> undersigned relies upon the treatment record which shows that the claimant's
> condition is controlled by medication when the claimant takes the medication
> as prescribed.
>
> Regarding claimant's credibility, the medical evidence does not support the
> severity and frequency of seizures that he has described.  Essentially, his
> work-up for seizure activities has been rather benign.  Also, the claimant's

---

[23]The actual appointment was on April 18, 2011.  The administrative law
judge in his decision used the date when the medical record of the appointment was
updated.

> failure to consistently comply with his prescribed medication regimen
> detracts from his credibility.  Specifically, the record shows that when the
> claimant takes his medication as prescribed, he is seizure free.

Tr. 73.  The administrative law judge concluded that Donlin and his girlfriend were not credible and that the opinion of Dr. Pinkert was not supported by the objective medical evidence.  Based on the residual functional capacity of a limited range of medium work and the testimony of a vocational expert,  the administrative law judge found that Donlin could not perform his past semi-skilled,  medium work as a forklift operator and machine operator but that he could perform his past unskilled, medium work as a warehouse worker.  Tr. 71-74.

In addition at step five of the sequential evaluation process, based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge found that Donlin could perform unskilled, medium jobs as a hand packager, janitor/cleaner, and production helper, and that there were a significant number of such jobs in the local and state economies.

Consequently, the administrative law judge found that Donlin was not disabled because he not only could perform one previous occupation but other occupations.

The administrative record in this case is 478 pages in length, primarily consisting of medical and vocational records.  The administrative law judge did an adequate job of reviewing Donlin's medical history and vocational background in his decision. Tr. 68-76.

Donlin argues that the administrative law judge erred by (1) failing to find that he met Listing 11.02 relating to convulsive epilepsy, (2) failing to explain the basis for his residual functional capacity assessment and (3) failing to give controlling weight to the opinions of Dr. Gilliam and Dr. Pinkert,   We have thoroughly reviewed the record in this case and find no merit in Donlin's arguments.

Donlin's first  argument is premised on the contention that he met or equaled the requirements of Listing 11.02.  Before we address the criteria/requirements of that listing we will mention some basic principles set forth in case law and the regulations of the Social Security Administration.  If Donlin's severe impairment met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits.  However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d).  To do this a claimant must show that all of the criteria for a listing are met or equaled. Id.  An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.  Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal

29

clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

To satisfy Listing 11.02, Donlin had the burden of proving that he had "convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With: A. Daytime episodes (loss of consciousness and convulsive seizures) or B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day."

Donlin has not marshaled sufficient evidence in the record to support his contention that his condition met or equaled the requirements of Listing 11.02. There is an absence of objective medical evidence supporting a finding that Donlin met Listing 11.02.  The closest that we come to the requirements of that listing is the opinion expressed by Dr. Pinkert.  However, the administrative law judge gave an

30

adequate explanation for rejecting Dr. Pinkert's opinion.  Furthermore, Dr. Pinkert only examined Donlin on (at most) two occasions and it is clear that his statement that Donlin had seizures occurring more frequently than once a month in spite of at least 3 months of prescribed treatment was solely based on Donlin's reports.  Also, Dr. Pinkert's opinion regarding the frequency of Donlin's seizures was in conflict with the opinion of Dr. Gilliam who was Donlin's primary care physician and on August 11, 2011, the second time Dr. Pinkert may have examined Donlin, Donlin reported that his seizures occurred mainly when he was sleeping and that he was doing better on medication.

No physician who treated Donlin indicated that Donlin was totally disabled for the requisite 12 month period required by the statute.[24]  The administrative law judge could reasonably reject Donlin's claims regarding the frequency of the seizure events and rely on the fact that he had previously performed medium work and there were no other physical impairments which would limit him from continuing to perform that level of work.  The bare medical records do not support Donlin's claim of total disability, including his claim that he met Listing 11.02.

Under the circumstances presented, it was clearly appropriate for the administrative law judge to conclude based on the medical records and Donlin's

---

[24]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

31

vocational history that Donlin had the physical functional ability to engage in a limited range of unskilled, medium work.

The administrative law judge found that Donlin's statements about his functional limitations were not credible to the extent they were inconsistent with the assessed residual functional capacity. When there is a paucity of objective medical facts supporting a claimant's alleged symptoms, the administrative law judge has to consider the claimant's credibility. To the extent that Donlin argues that the administrative law judge did not properly consider his credibility, the administrative law judge was not required to accept Donlin's claims regarding his physical impairments. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Donlin testify, the administrative law judge is best suited to assess his credibility.

We are satisfied that the administrative law judge appropriately took into account all of Donlin's physical limitations in the residual functional capacity

32

assessment. Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Therefore, the court will affirm the decision of the Commissioner.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:        June 18, 2014